UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
X------------------------------------------------------------------------X

DINA ROACH, IVELINA CRUZ, ARCHIL LOMIDZE
and ZAKIR HOSSAIN, individually and on behalf of all
others similarly situated,

                                    Plaintiffs,

                  -against-

THE CITY OF NEW YORK, DAVID DO, Chair of the
NYC Taxi and Limousine Commission, ANDREW
RABIN and ANITA ARMSTRONG.

                                 Defendants.
X------------------------------------------------------------------------X

        \_\_-CV-\_\_ (\_\_\_)

    **CLASS ACTION**
    **COMPLAINT**

    **JURY TRIAL**
    **DEMANDED**

        Plaintiffs Dina Roach, Evelina Cruz, Archil Lomidze and Zakir Hossain by their attorney Daniel Ackman, for their Complaint allege as follows:

### NATURE OF THE ACTION

        1.     This action concerns the unlawful and unconstitutional policy and practice of the New York City Taxi and Limousine Commission (TLC) of summarily suspending the licenses of taxi and for-hire vehicle drivers (collectively, taxi drivers or drivers) based on an arrest without a hearing of any kind and without even a cursory review of the alleged incident or the driver's record.

        2.     The NYC Administrative Code permits the TLC to suspend taxi driver licenses without a hearing, but only if there is good cause to consider the driver's licensure to be a direct and substantial threat to public health or safety. The TLC nevertheless summarily suspends more than 1,500 drivers annually without such cause.

1

3.      Instead, it suspends based on the driver having been arrested, a practice that is not authorized by the NYC Code. The TLC does so without any inquiry into the facts and circumstances underlying the arrest and without regard for the driver's record and knowing full well that it will eventually reinstate the vast majority of them either through the post-suspension hearing process or, much more often, upon the disposition of the arrest charges.

4.      This practice is in violation of the NYC Administrative Code, denies drivers both procedural and substantive due process, overrides the presumption of innocence afforded to criminal defendants and forces drivers to consent to the publication or the fact of their arrest.

5.      Above all, the practice is gratuitous, pointless and irrational. While supposedly based on the need to protect public health or safety, it has offers no discernible protection to taxi and for-hire vehicle passengers or the public at large.

6.      There is no evidence in the historical record (including the long history of the *Nnebe v. Daus* litigation) that remotely suggests that a driver who has been arrested is, without more, a direct and substantial threat to public safety going forward. Nor is there any logical reason to believe that a drive who has allegedly committed a crime, especially if off-duty is an actual threat to passengers going forward.

7.      What the TLC policy surely does is deny drivers their ability to earn a living.

8.      The TLC's longstanding post-suspension hearing process was held to be unconstitutional by the Second Circuit Court of Appeals in *Nnebe v. Daus*, 931 F.3d 66 (2d Cir. 2019) (*Nnebe II*) , and has led to reforms mostly by the NYC Office of Administrative Hearings (OATH).

9.      In an earlier decision, the Second Circuit had held that due process did not require a pre-suspension hearing despite the "general rule … that a pre-deprivation hearing is required."

*Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011) (*Nnebe I*). The Court based this determination on the factual assertion, as *Nnebe II* put it, that at the time of the initial suspension (usually within a day of the arrest), "little was known about the driver and the charged crime."

10.    Since *Nnebe II*, much new evidence has come to light indicating, among other relevant factors:

> (a) that the TLC can easily learn the basic facts of the alleged crimes, but deliberately chooses not remain ignorant;
>
> (b) that very few of the drivers who it suspends have any prior criminal record or have any mark in their TLC record indicating that they pose any threat to passengers or the public at large;
>
> (c) that the TLC knows that the vast majority of drivers who are arrested will have their criminal charges dismissed or reduced;
>
> (d) that the TLC will ultimately reinstate these drivers without any inquiry into the circumstance of the alleged crime;
>
> (e) that very few driver are re-arrested while their criminal charges are pending; and
>
> (f) that only a tiny percentage of arrests involve an alleged offense where a passenger is a victim.

11.    Newly established facts further indicate that a large majority of suspended drivers who are afforded hearings are reinstated through that process even though the hearing judges assume that the criminal charges are true.

12.    New evidence also demonstrates that in ordering summary suspensions the TLC systemically disregards easily obtained information that would undermine any finding—and would certainly be relevant to any decision to suspend—that a driver's arrest by itself demonstrates that he is a direct and substantial threat to public safety.

13.    A large majority of suspended drivers—most of whom are immigrants unfamiliar with legal processes and rights— do not pursue hearings. Most of these drivers are also

reinstated after their arrest charges are favorably resolved. But these reinstatements are often months after their suspensions.

## JURISDICTION AND VENUE

14.    This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

15.    The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(4), 1367, and 2201.

16.    Venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b) because the county is in this District, because plaintiffs reside in this district and because a substantial part of the events giving rise to the claims occurred in this District.

## PARTIES

17.    Dina Roach is a resident of Queens County and a for-hire vehicle (FHV) driver who accepts fares through the ride-share services Uber and Lyft. She has an unblemished record as a FHV driver and has no criminal record. Nevertheless, when she was arrested on December 29, 2022 for assault in the second degree, petit larceny, and related charges, the TLC suspended her license without any inquiry or consideration of her record and without a hearing. The assault charge was dropped the same day by the district attorney at Ms. Roach's arraignment.

18.    The suspension order signed by Andrew Rabin, a TLC attorney, noted the fact of Ms. Roach's arrest, reciting the arrest charges, including those that had already been dropped. It did not even allege that she posed a threat to public safety. It also did not allege that the TLC Chair had issued the order, was aware of the order or had formed any belief about the propriety of the suspension.

19.     Ms. Roach requested a hearing at OATH. After the first and only consideration of the facts underlying the arrest and her record, the OATH administrative law judge (ALJ) recommended her reinstatement. Despite the TLC Chair's acceptance of that recommendation, she was suspended for approximately 36 days.

20.      Evelina Cruz is a resident of Queens County is a for-hire vehicle (FHV) driver who accepts fares through the rideshare services Uber and Lyft. She has an unblemished record as a FHV driver and has no criminal record. Nevertheless, after she was arrested on criminal mischief and assault charges on September 14, 2022, the TLC suspended her license without a hearing and without any inquiry or consideration of her record.

21.     The suspension order signed by Anita Armstrong, a TLC attorney, noted the fact of Ms. Cruz's arrest, but did not even allege that she posed a threat to public safety. It also did not allege that the TLC Chair had issued the order, was aware of the order or had formed any belief about the propriety of the suspension.

22.     Ms. Cruz requested a hearing at OATH. After the first consideration of the facts underlying the arrest and her record, the OATH ALJ recommended her reinstatement. Despite the TLC Chair's acceptance of that recommendation, she was suspended for approximately 35 days.

23.     Archil Lomidze, a resident of Kings County, was summarily suspended on January 17, 2023 after he was arrested on misdemeanor assault charges emanating from a dispute between Mr. Lomidze and an employee of his child's daycare center.

24.     The suspension order signed by Andrew, a TLC attorney, noted the fact of Mr. Lomidze's arrest, but did not even allege that she posed a threat to public safety. It also did not

allege that the TLC Chair had issued the order, was aware of the order or had formed any belief about the propriety of the suspension.

25.    Following a hearing, an OATH ALJ recommended that Mr. Lomidze's suspension be extended. A TLC lawyer, Sherryl Eluto, not the Chair, accepted that recommendation and Mr. Lomidze's license remained suspended.

26.    On or about May 5, 2023, the charges against Mr. Lomidze were dismissed. By that time his suspension had lasted for 108 days.

27.    Zakir Hossain, a resident of New York County, was summarily suspended on February 17, 2023 after he was arrested on assault and strangulation charges, including a charge that had already been reduced, emanating from a dispute between Mr. Hossain and his wife.

28.    The suspension order signed by Andrew Rabin, a TLC attorney, noted the fact of Ms. Hossain's arrest, but did not even allege that she posed a threat to public safety. It also did not allege that the TLC Chair had issued the order, was aware of the order or had formed any belief about the propriety of the suspension.

29.    At the time of his arrest, Mr. Hossain had no criminal record and had never been even accused of assaulting or threatening a passenger.

30.    Following a hearing, an OATH ALJ recommended that Mr. Hossain's suspension be extended. A TLC lawyer, Sherryl Eluto, not the Chair, accepted that recommendation and Mr. Hossain's license remains suspended.

31.    Defendant City of New York is a municipality of the state of New York.

32.    Defendant David Do is Chair of the TLC.

33.    Andrew Rabin is a TLC lawyer who orders summary suspensions of TLC-licensed drivers.

34.    Anita Armstrong is a TLC lawyer who orders summary suspensions of TLC-licensed drivers.

## BACKGROUND

### THE TLC SUMMARY SUSPENSION REGIME

35.    The NYC Administrative Code § 19-512.1 allows, but does not require, the TLC to suspend licensees who pose a direct and substantial threat to public safety. It provides:

> The [TLC] or successor agency may, for good cause shown relating to a direct and substantial threat to the public health or safety and prior to giving notice and an opportunity for a hearing, suspend a taxicab, for-hire vehicle license or a HAIL license issued pursuant to this chapter….

36.    This section is the only provision in the NYC Code that even arguably authorizes summary suspension of a taxi or FHV driver's license.

37.    Nevertheless, the TLC routinely suspends drivers without a hearing *and* without any factual basis that for a finding that the driver's licensure poses a direct and substantial threat to the public health or safety. Instead, the TLC summarily suspends drivers following an arrest without any knowledge of the facts and circumstances underlying the arrest and without regard for the driver's overall record.

38.    There is no City or State statute that permits or requires the suspension of a taxi driver's license based on an arrest.  Nor does any City or State statute say or suggest that an arrestee is necessarily or even probably a threat to public safety.

39.    In making an arrest, a police officer is not required to determine and in fact does not determine that the arrestee poses any threat to public safety much less the direct and substantial threat to the public health or safety contemplated by Section 19-512.1.

40.     Section 19-512.1 further provides that, following a summary suspension, "The licensee shall have an opportunity to request a hearing before an administrative tribunal of competent jurisdiction within ten calendar days after receipt of any such notification."

41.     The TLC has enacted a rule, specifically Rule 68-15, titled "Special Procedures – Summary Suspension Pending Revocation." It permits, but does not require, per subsection (a), a summary suspension "if the Chairperson believes that continued licensure would constitute a direct and substantial threat to public health or safety, pending revocation proceedings."

42.     Subsection (a) of TLC Rule 68-15 allows suspensions based on actions, not allegations, and the actions that spur suspension must constitute violations of TLC rules. Thus subsection (a)(1)(i) allows the TLC to suspend for "[a]ny act, as prohibited by [TLC] Rules, of driving a TLC licensed vehicle while Impaired by intoxicating liquor (regardless of its alcoholic content), or Drugs." Subsection (a)(1)(ii) permits suspensions for "[a]ny act, as prohibited by these Rules, of bribery, fraud, material misrepresentation, theft, threat against a person, harassment, abuse, or use of physical force."

43.     Subsection (d) of Section 68-15, however, purports to permit the TLC chair to summarily suspend a driver based on an arrest on criminal charges. It also requires that the Chair believe "that the charges, if true, would demonstrate that continued licensure would constitute a direct and substantial threat to public health or safety." The rule provides:

> (1) The Chairperson can summarily suspend a License based upon an arrest or citation if the Chairperson believes that the charges, if true, would demonstrate that continued licensure would constitute a direct and substantial threat to public health or safety. Such charges include but are not limited to the following:
>
> (i) Any arrest for a crime which constitutes a felony;
> (ii) Or any arrest or citation for the following offense … [listing 18 separate misdemeanors].

8

44.     This rule purportedly permits the TLC Chair to suspend a driver based on an arrest—but only if the Chair believes the driver would be a direct and substantial threat to public safety.

45.     In fact, the Chair plays no role in suspending drivers based on arrest. The Chair does not consider the case at all and forms no belief at any time. Nor do the TLC officials who actually order the suspensions form any belief. These officials do not consider the surrounding facts or the context of the arrest. Instead, they apply a mechanical rule. Unlike the governing statute, however, the de facto rule does not requiring any finding (or evidence or belief) that the driver's licensure presents a direct and substantial threat to public safety.

46.     If the Chair (or the TLC officials who actually order the suspensions) systemically and deliberately refuses to consider even basic information about the charges, even information in a police report which can be read a digested in a matter of minutes, such deliberate ignorance renders baseless any belief the chair may have about the merits of a suspension.

47.     Citing Rule 68-15(d), the TLC's practice is to suspend any driver for whom it receives a notice of arrest from the NY Division of Criminal Justice Services where the arrest charges are among those listed in the rule.

48.     The TLC suspends without any investigation or inquiry into to driver's work record, his criminal record or lack thereof, his TLC disciplinary record or the facts and circumstances of the arrest. Thus a driver may have completed 20,000 or 40,000 fares without ever harming or threatening a passenger, but will be suspended based on an arrest, even if the arrest is for a misdemeanor.

49.     Despite the name, the process is only rarely "pending revocation" as very few drivers are ever revoked due to the disposition of the criminal charges. Indeed, in the last three

years, fewer than 20 drivers have had the licenses revoked based on a criminal conviction. This is despite the fact that TLC Rule 68-14 permits for "any conviction" of the same charges, including many misdemeanors, for which the TLC automatically suspends.

50.    In addition, the TLC suspends without the Chair reviewing the facts, without consideration of the driver's record, and without the Chair having actually formed and belief that the driver's licensure while the arrest charges are pending presents any direct or substantial threat to public safety.

51.    The TLC's suspension-on-arrest regime is highly unusual and likely a unique. While the State and City of New York license and regulate more than 75 trades and professions, a review by counsel could not find any other agency that routinely suspends a trade license based solely on an arrest.

52.    Of the next four largest cities in the United States (Los Angeles, Chicago, Houston and Philadelphia) none have any published taxi rule or regulation requiring or permitting the suspension of a taxi driver's license based on an arrest.

53.     Despite the language of the Code and even the TLC rule, the Chair never orders the suspensions. They are ordered instead by a TLC lawyer, who does not confer with the Chair and who normally does not even allege that the driver poses a direct and substantial threat to public safety.

**The TLC's Willful Ignorance**

54.    At the time of the suspension, the TLC does not even know or inquire whether the alleged crime was committed on-duty or whether it violated any of the myriad rules that have been propounded by the agency.

55.     That employee suspends automatically based on the fact of arrest and whether the charged offense is listed in Rule 68-15.

56.     The TLC orders such suspensions routinely. Indeed, in the year before the *Nnebe* decision was announced, the TLC suspended more than 1,700 taxi drivers upon arrest.

57.     As noted, nothing in New York law that provides or even suggests that an arrest demonstrates that the arrestee is a direct and substantial threat or that an arrest, by itself, is equivalent to such a threat. An arresting officer is not required to make (and does not make) a finding that an arrestee poses such a threat.

58.     The TLC acts without reflection or investigation even though neither Section 19-512.1 nor TLC Rule 68-15 *requires* a suspension— even if there is good cause shown.

59.     The TLC's ignorance of the facts and circumstances of the arrest is deliberate. The agency acts without any investigation of the alleged facts and circumstances that led to the arrest, without any consideration of the driver's overall record, and without regard to the fact that the driver has no prior criminal record.

60.     The TLC could easily and quickly learn prior to any suspension, among other pertinent fact: (a) whether the victim of the alleged crime was a taxi passenger; (b) whether the driver had any criminal record or prior arrests; (c) whether the driver had any serious TLC rule violations on his record; (d) whether the driver was released from custody on his own recognizance or was never even taken into custody by the arresting officer; and (e) the driver's age and years of service.

61.     The TLC, however, deliberately refuses to obtain, much less consider, such information prior to any suspension.

62.     Thus, the TLC suspends without so much as asking the driver about the events that led to the arrest and without even obtaining or reading the police report, which would indicate at least whether the alleged crime was committed while the driver was on duty or whether the alleged victim was a passenger. Nor does the TLC obtain a copy of the criminal complaint, which would indicate whether the arrest charges are, in fact, being prosecuted.

63.     In addition, when the TLC does obtain the police report and or the criminal complaint, it never changes its position based on this additional knowledge, never lifts a suspension voluntarily, and never alters its demand at OATH that the summary suspension be continued.

64.     The TLC persists in this extraordinary practice despite knowing that taxi drivers are rarely convicted on the arrest charges.

65.     Overall, in the City of New York, the conviction rate for misdemeanor arrests as of 2021 was less than 15%.

66.     The conviction rate for taxi drivers is likely much lower. Indeed, in a recent five-year period, the TLC suspended 6,669 drivers on arrest, but admitted that just 15 TLC licensees had their licenses revoked due to a criminal conviction. Just two of the 15 convictions were for assault, both misdemeanors. Neither of the two was known to involve a passenger.

### FACTS DEVELOPED SINCE THE 2019 NNEBE DECISION

67.     In its 2019 decision, the *Nnebe II* Court adhered to its view, expressed in an earlier decision in the same case that no procedural due process violation in the TLC's initial suspension-on-arrest practice. But it did so based on its understanding that the TLC was acting in the immediate aftermath of an arrest "with minimal information at its disposal."

68.    Since *Nnebe II* was announced, it has become clear that the TLC has much more relevant information (and has easy access to more relevant information) than it told the *Nnebe* Court. This information is about the taxi driver population in general, about the population of arrested drivers and about the particular drivers who it suspends upon arrest.

69.    This known (and now revealed) information undermines the presumption that a driver who is arrested is a threat to public safety. It also undermines the presumption enforced at post-suspension hearings that the arrest charges are "true."

70.    In the last three years, there has not been a single reported OATH decision finding that a driver had assaulted or used physical force against a passenger

71.    Likewise, in sworn testimony concerning a different four-year period, a former TLC general counsel admitted that he was aware of just two convictions of taxi drivers for crimes of violence. Neither one was known to involve a passenger.

72.    It is has become clear since *Nnebe II* that (a) that a large majority of drivers who pursue hearings at OATH are recommended to be reinstated and (b) that most drivers who lose at OATH (that is for whom OATH ALJs recommends an extended suspension) are ultimately reinstated as well.

73.    Indeed, of the first 100 post-*Nnebe II* OATH hearings, 67 drivers prevailed at OATH (including four who prevailed only to have the Chair reject the OATH ALJ recommendation). Of the 37 drivers for whom OATH recommended an extended suspension or for whom the Chair extended an extended suspension, at least 28 were later reinstated after a favorable disposition of their criminal charges. All told, 91% of the drivers who the TLC suspended for posing an excessive threat to public safety were later reinstated by the OATH or by the TLC itself.

**Facts Concerning Taxi Drivers as a Group**

74.     The TLC knows, or has access to data showing that taxi drivers are arrested at a far lower rate that the NYC population at large.

75.     It knows that, by definition, taxi drivers are gainfully employed.

76.     It knows that few taxi drivers have criminal records *because* individuals with criminal records are unlikely to pass a TLC background check and be licensed in the first place. It further knows that drivers who had been convicted of any felony or of many misdemeanors are likely to have had their licenses revoked.

77.     The TLC knows that taxi drivers as a group rarely assault or threaten passengers. Indeed, in the cases described in post-suspension hearings following *Nnebe II*, fewer than 3% involved crimes alleged to be against a passenger.

78.     It knows that second arrests while charges are pending against a driver are quite rare. Indeed, in the *Nnebe* class period from 2003 through 2020, the TLC suspended more than 19,500 drivers based on an arrest. Of those, fewer than 500 (about 2.5%) were rearrested in the six months following their suspensions.

**Facts Concerning Alleged Offenses Leading to Suspensions**

79.     The TLC knows that of top charges in arrests of taxi drivers more than 60% are misdemeanors.

80.     It knows that of alleged crimes by taxi drivers the vast majority are committed off-duty.

81.     The TLC has ready access to facts about the alleged crime in particular cases. It can easily obtain police reports and criminal complaints. But it never does so unless the suspended requests a hearing.

82.    The police report indicates some detail about the alleged crime and almost always informs the TLC of whether the alleged crime involved a passenger or was on-duty.

83.    The TLC can obtain a copy of this report simply by sending an e-mail to an attorney in the NYPD Legal Bureau, who typically responds within a day. The TLC, however, only requests the repost post-suspension, indeed only after a hearing is requested.

84.    The TLC can also obtain a copy of the criminal complaint simply e-mailing the trial prep assistant at the district attorney's office. That document provides some detail in the form of statement stating the complainant's accusation.

85.    The TLC has ready access to the driver's TLC record, which would indicate whether the driver had ever been accused of threatening or assaulting a passenger (whether or not that conduct led to an arrest). But the TLC does not review or consider the driver's record no matter how unblemished, but TLC suspends the driver based on the fact of arrest.

86.    When there is a hearing and the TLC obtains the police report and the criminal complaint, the facts it now knows have never caused it to reconsider its view that the driver should be suspended. Instead, it argues in every case that the suspension should be extended.

87.    The failure to make even this minimal effort or to consider the relevant factors demonstrates that TLC is not making a good faith determination that the drivers licensure in fact poses a direct and substantial threat to public safety when it orders suspensions.

**Facts Concerning the Likelihood of Reinstatement**

88.    The TLC knows that small percentage of taxi drivers are convicted on the arrest charge. Thus a large majority are reinstated without any further inquiry by the TLC, but only serving often lengthy suspensions.

89.    Of the more than 19,000 drivers suspended on arrest during the 17-year *Nnebe* class period, at least 77% were later reinstated. This percentage could be even higher as it does not include some drivers who were reinstated, but have since let their licenses lapse.

90.    Of the drivers who have had OATH hearings between the *Nnebe II* decision and the end of 2022, 89% were reinstated. Of the drivers who were reinstated, 63% were reinstated through the hearing process and another 26% were reinstated after their criminal charges were dismissed or reduced despite the fact that OATH ALJs recommended that their suspension be extended.

91.    In sum, a large majority of the summary suspensions premised on arrests have proved erroneous, including a majority of suspensions approved of and extended by OATH ALJs.

## THE ABSENSCE OF ANY RELATIONSHIP BETWEEN ARREST AND HARM OR EVEN THREAT TO PASSENGERS

92.    In the three years since the Nnebe decision was issued, the TLC was a party to approximately 150 post-suspension hearings. Just 15% of the alleged crimes considered at those hearings involved on-duty incidents. Fewer still (less than 3%) involved passengers as the alleged victims. (The rest mostly involved complaints by other motorists or, more rarely, by cyclists or pedestrians.)

93.    In the last three years, there has not been a single decision reported by OATH concerning the revocation of taxi driver's license as a result of a criminal conviction. (There have been a few revocations based on non-criminal convictions for driving while ability impaired in violation of the New York Vehicle and Traffic Law.)

94.     There is no evidence or reason to believe that most— and certainly not all— drivers who are arrested on charges listed in TLC Rule 68-15 pose any real threat to public safety or the taxi-riding public.

95.     The TLC is fully aware of the fact that more than 60% of the drivers who appear at post-suspension hearings have been reinstated via the hearing process.

96.     This high rate of reinstatement is despite the fact that at the hearings the TLC has more evidence at its disposal (namely the police report and the criminal complaint) than it did at the time of the suspension. It is also despite the fact that OATH ALJs are told to assume— counterfactually— that the arrest charges are "true."

97.     The TLC likewise knows that a large majority of drivers *whose suspensions are extended* post-hearing are ultimately reinstated upon disposition of the arrest charges.

98.     Upon a favorable disposition of the arrest charges, the TLC reinstates drivers again without any inquiry into the facts and circumstances of the crime that had been charged, without any consideration of the driver's record, and without knowing why the charges were dismissed or reduced. The TLC also knows that few, if any, of the drivers it suspends and later reinstates—without any consideration of the substance of the arrest charges and without considering why the charges were dismissed or reduced—assault or threaten passengers after their reinstatement.

99.     The TLC persists in its practice despite there being no New York or federal case law that holds that the fact of an arrest is proof or even evidence that the arrestee is a threat to public health or safety.

## THE POST-SUSPENSION HEARINGS

100.    The TLC does afford drivers a post-suspension hearing. But such hearings are not scheduled automatically. They require a driver's request and the driver must retain his own counsel.

101.    Only after an OATH hearing is scheduled does the TLC ask for a copy of the police report created upon arrest or the criminal complaint presented at arraignment.

102.    At such hearings, the TLC *always* argues that the suspension should be extended, again without regard to the driver's work record, his lack of criminal record, his TLC disciplinary record or the facts and circumstances of the arrest. In other words, the police report and the criminal complaint never change the TLC's view, however counter-factual, that the arrest itself demonstrates a direct and substantial threat to public safety.

103.    Pursuant to TLC Rule 68-15(d)(3), "At the Summary Suspension hearing, the issue will be whether the charges underlying the Licensee's arrest, if true, demonstrate that the continuation of the License while awaiting a decision on the criminal charges would pose a direct and substantial threat to public health or safety." That is the same standard that the rule imposes for the *initial* suspension, but which the TLC does not actually adhere to when ordering the suspension in the first instance.

104.    Thus, only if a hearing is scheduled does the TLC attempt to meet the standard that the NYC Code requires it meet when ordering the summary suspension—that is, that the driver's licensure poses a direct and substantial threat to public safety.

105.    An ordinary reading of the "if true" language of subsection (d)(3) would allow the ALJs to consider or even determine that the criminal charges are likely not "true" or may not be "true." Such a finding by the ALJ might be strong grounds for a determination that the driver

18

does not pose a direct and substantial threat to public safety. But the ALJs, deeming themselves bound by the TLC's reading of its rule, are effectively barred from such an analysis.

106.    There is nothing in the NYC Code § 19-512.1 (or in any other City or State statute) that directly or even remotely requires permits this extraordinary presumption of guilt.

107.    There is no language even in the TLC rule, read normally, that requires this extraordinary presumption.

108.    In addition to being in conflict with the presumption of innocence, the presumption proves false in that a large majority of drivers who are suspended on arrest are later reinstated. The fact of reinstatement indicates that the driver was not convicted on any charge listed in TLC Rule 68-15 because, if they were convicted they would be subject to revocation pursuant to TLC Rule 68-14. (TLC Rule 68-14 permits revocation upon conviction of any of the same crimes listed in Rule 68-15, without requiring any consideration of the facts or circumstances of the conviction or the driver's overall record.)

109.    At the post-suspension hearings, the TLC never offers any testimony. Instead it relies on the police report and/or the criminal complaint, both containing hearsay or double hearsay. Meanwhile, for drivers to mount an effective defense, they generally must testify about the alleged crime, though they are not required to do so.

110.    The OATH ALJ issues a recommended decision as to whether the suspension shall continue while the arrest charges are pending. The OATH ALJ's decision, can recommend the driver's reinstatement, but cannot order it.

111.    Following the filing of the recommended decision, the TLC chair, pursuant to TLC Rule 68-10, "will determine whether to accept, modify, or reject the Recommendation of the OATH ALJ and will issue a Final Decision."

112.    In fact, this review is almost always not even conducted not by the Chair. Instead the chair delegates it to a TLC lawyer. Even if the Chair actually engaged in a review of ALJ recommendations, this chair-review policy— which makes the chair the ultimate judge of whether a suspension shall be extended—is not authorized by NYC Code § 19-512.1 or by any other provision of local law.

113.    The OATH Report and Recommendation is a public document and is available on at least two websites. It states the driver's name and recites the fact of arrest and even the underlying allegations. These documents remain public even after the arrest charges are dismissed and the arrest record is otherwise sealed.

## VIOLATIONS OF THE CITY CHARTER

114.    The TLC practice ignores the City Charter. Like all city agencies, the TLC is governed by the City Administrative Procedure Act (CAPA). Part of the City Charter, CAPA governs how an agency may enact a rule. CAPA § 1043 requires public notice and comment before any new rule or amendment. There is no other way, as the Charter plainly provides: "No agency shall adopt a rule except pursuant to this section." § 1043.

115.    This notice-and-comment requirement is a central principle of administrative law. It appears not just in CAPA, but at the federal level in the Administrative Procedure Act (5 USC § 553[c]) and the state level in the State Administrative Procedure Act (see SAPA § 202 [5] [b], [c]). The notice-and-comment requirement applies not just to rules labeled as such but to (1) "any statement or communication of general applicability that … implements or applies law or policy;" (2) "standards which if violated may result in a sanction or penalty;" and (3) "standards for the issuance, suspension or revocation of a license or permit." § 1041(5).

116.    Under this definition, the standard by which the TLC suspends licenses is a rule that is subject to the notice-and-comment requirement and requiring enactment by a majority vote of the nine commissioners.

117.    Despite the clarity of this requirement, the TLC commissioners have never actually passed or enacted the TLC's *de facto* rule by which a TLC employee *must* or *shall* suspend without any evidence-based finding of a direct and substantial threat. Thus the *de facto* rule was enacted in violation of the Charter.

118.    The TLC summary suspension rule, now numbered Rule 68-15, has gone through multiple iterations. But the TLC commissioners who vote on TLC rules have no authority to enact any rule that would nullify the direct-and-substantial-threat requirement mandated by the Code.

## PLAINTIFFS' SUSPENSIONS

### Dina Roach

119.    At the time of her arrest, Ms. Roach had been working for ten years as a licensed TLC driver for various livery car services. She had a master's degree in finance and accounting, and previously worked as a comptroller for a theater company. She had completed nearly 40,000 trips, she had never been accused of assaulting or threatening a passenger. She also had never been arrested before, much less convicted of any crime. There was nothing in her record that would suggest she was a direct and substantial threat to public safety.

120.    The TLC suspended her license when she was arrested without even reading the police report and without a factual investigation of any kind.

121.    As found by the OATH ALJ, Ms. Roach was arrested after she completed a fare and her passenger announced he could not pay. In response, Ms. Roach went to nearby police

precinct to file a complaint. There was no explanation for why respondent would have gone to the police other than to report the complainant for nonpayment.

122.    The complainant against Ms. Roach was the non-paying passenger whose statements were utterly inconsistent. A leaving the scene of an accident charge was based on the stating that he held onto respondent's car for 200 feet. This statement would mean the complainant somehow held onto a moving vehicle for two-thirds the length of a football field. But the police report states that the complainant only held onto the car for "several" feet and suffered a "minor injury."

123.    The robbery charge was based on the alleged taking or refusing to return the passenger's cell phone even after he finally paid the fare. There was no explanation for why the driver would have kept the passenger's phone, which was found in the back seat of the car where the passenger was sitting.

124.    After arraignment she was released on her own recognizance.

125.    In seeking the extension of her summary suspension, the TLC cited only the arrest charges and the pending charges, noting no other factors.

### Ivelina Cruz

126.    At the time of her arrest, Ms. Cruz had been a FHV driver for less than two years. But during that time she drove patients for a medical transportation company and later drove for Uber and Lyft. She completed about 1,700 fares for the ride-share services and earned perfect or near-perfect passenger ratings from both. Never before had Ms. Cruz been convicted of a crime, arrested, or accused of violating any TLC rules. There was nothing in her record that would suggest she was a direct and substantial threat to public safety.

127.    The TLC suspended her license when she was arrested without even reading the police report and without a factual investigation of any kind.

128.    Ms. Cruz was charged with assault based on an incident that occurred just after midnight on September 2, 2022, in which she allegedly pushed and pulled the hair of a complaint who Ms. Cruz believed was having an affair with her husband. The ALJ credited her testimony that she confronted the complainant, but the complainant was the first to use force. Ms. Cruz later received a phone call from a detective and went to her local precinct where she was arrested.

129.    After arraignment she was released on her own recognizance.

130.    In seeking the extension of her summary suspension, the TLC cited only the arrest charges and the pending charges, noting no other factors.

**Archil Lomidze**

131.    At the time of his suspension, Mr. Lomidze had held TLC license for seven years, had completed approximately 16,000 trips and had a 4.98 rating with Uber and a 5.0 rating with Lyft. He had immigrated to the United States from Russia and had been granted him asylum after a process involving testimony before an immigration judge, a background check, and consideration of respondent's education and employment history as a licensed electrician in Russia. he had never even been accused of assaulting or threatening a passenger (Tr. 75).

132.    Beginning with this extremely positive record, Mr. Lomidze was accused of striking man named Vadim, a representative of a daycare center in contentious relationship with his brother's family, with an open hand.

133.    It was undisputed that Mr. Lomidze was responding to instigation and threats to his family. The OATH ALJ found that Vadim was cursing and threatening respondent's family. He further found that Vadim pushed respondent's brother and mother, who was holding Mr. Lomidze's four-year-old nephew.

134.    All of this occurred after another daycare worker, Victor, made menacing, insulting and nativist remarks to Mr. Lomidze's sister-in-law. Victor also said that Mr. Lomidze's brother was an immigrant not "entitled to anything," but that he, Victor, was an American citizen who could do "whatever he wants."

135.    Mr. Lomidze requested a hearing after which the ALJ recommended his suspension he extended.

136.    The charges against Mr. Lomidze were later dismissed.

## Zakir Hossain

137.    At the time of his arrest, Mr. Hossain had been a had been licensed by the TLC for over 20 years and had been active as a FHV for over eight years, driving mostly for Uber and Lyft. He had a perfect of near-perfect customer rating from both services. He had completed roughly 17,000 fares, had never been accused of assaulting or threatening to assault a passenger and had no serious TLC violations on his record. He had been arrested once before, 23 years earlier.

138.    The TLC suspended his license when he was arrested without even reading the police report and without a factual investigation of any kind.

139.    Mr. Hossain was charged by the arresting officer with assault in the second degree, a felony and strangulation in the second degree, both felonies, and related charges. At his arraignment, the assault charge was reduced to a misdemeanor. As the police report made clear, the charges were all based on a domestic incident between Mr. Hossain and his wife.

140.    After arraignment he was released on his own recognizance.

141.    In seeking the extension of her summary suspension, the TLC cited only the pending charges, noting no other factors.

142.    Mr. Hossain requested a hearing.

143.    At that hearing, the TLC relied solely on the fact that Mr. Hossain had been arrested on charge listed in TLC Rule 68-15.

144.    The OATH ALJ recommended that his suspension be continued.

145.    The Chair did not review the ALJ's recommendation. Instead a TLC lawyer reviewed the ALJ's recommendation and accepted it.

146.    Mr. Hossain is currently suspended.

## CLASS ALLEGATIONS

147.    The Plaintiff Class seeks (i) a declaration that the TLC policy of summarily suspending licenses is unconstitutional; (ii) a declaration that the summary suspension policy, TLC Rule 68-15,  and the presumption of guilt policy are in violation of the NYC Code; (iii) an order enjoining defendants from suspending licenses prior to affording taxi drivers proper and meaningful hearings on the merits; (iv) an order mandating that unlawfully suspended licenses be reinstated; and (iv) compensatory and punitive damages.

148.    Plaintiffs sue on behalf of themselves and all other similarly situated individuals who the TLC has suspended based on an arrest pursuant to Rule 23 (a), Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. They seek to represent two subclasses. The first subclass is comprised of all drivers suspended on arrest whose suspensions are still ongoing. This subclass is seeking injunctive relief. The second subclass is comprised of all drivers suspended on arrest whose suspensions have since ended.

149.    The class period commences on the date three years prior to the date of this complaint and extends to the date on which the defendants are enjoined from, or otherwise cease, enforcing their unconstitutional policies and practices.

150.    The members of the class and each subclass are so numerous as to render joinder impracticable. Upon information and belief, based on TLC public records, there are more than 100 drivers whose licenses have been suspended prior to hearings on the merits. In addition, there are more than 100,000 taxi and for-hire vehicle drivers licensed by the TLC, all of whom are subject to the TLC's license suspension and revocation policies.   The vast majority of New York City taxi drivers are foreign born, most from countries with no tradition of civil rights.

151.    Upon information and belief, joinder is impracticable given the number of absent class members and because many members of the class are low-income persons, many of whom do not speak English well and likely would have great difficulty in pursuing their rights individually.

152.    The questions of law and fact common to the class and both subclasses include whether the class members have common rights under the Fifth and Fourteenth Amendments to be free from unconstitutional license suspensions.

153.    The named plaintiffs are adequate representative of the class. The violations of law alleged by plaintiffs stem from the same course of conduct by defendants, which violated and continue to violate the rights of members of the class; the legal theory under which the named plaintiffs seek relief is the same or similar to that on which the class will rely. In addition, the harm suffered by the named plaintiffs is typical of the harm suffered by absent class members.

154.    The named plaintiffs have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the class. Counsel for the plaintiffs knows of no conflicts among members of the class.

155.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because: (a) the prosecution of hundreds or thousands of separate actions would be inefficient and wasteful of legal resources; (b) the members of the class may be scattered throughout New York City and State and are not likely to be able to vindicate and enforce their constitutional and statutory rights unless this action is maintained as a class action; (c) the issues raised can be more fairly and efficiently resolved in the context of a single class action than piecemeal in many separate actions; (d) the resolution of litigation in a single forum will avoid the danger and resultant confusion of possible inconsistent determinations; (e) the prosecution of separate actions would create the risk of inconsistent or varying adjudications with respect to individuals pursuing claims against defendants which would establish incompatible standards of conduct for defendants; (f) defendants have acted and will act on grounds applicable to all class members, making final declaratory and injunctive relief on behalf of all members necessary and appropriate; and (g) questions of law and/or fact common to members of the class especially on issues of liability predominate over any question, such as that of individual damages, that affect individual members.

### FIRST CLAIM FOR RELIEF / 42 U.S.C. § 1983 – DUE PROCESS – SUSPENSIONS WITHOUT HEARINGS

156.    Plaintiffs repeat and re-allege paragraphs 1 through 155 as if the same were fully set forth at length herein.

157.    By implementing, promulgating, and continuing to enforce and/or effectuate a policy, practice, and custom pursuant to which taxi and for-hire vehicle drivers may have their licenses summarily suspended based on unproven allegations, in the absence of evidence, and without a hearing, defendants have deprived and will continue to deprive each and every plaintiff and all members of the plaintiff class of rights, remedies, privileges, and immunities

guaranteed to every citizen of the United States in violation of 42 U.S.C. § 1983, and of rights guaranteed by the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

158.    All defendants have acted under pretense and color of state law and in their individual and official capacities and within the scope of their employment. Said acts by said defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, knowingly, and with the specific intent to deprive plaintiffs of their constitutional rights secured by 42 U.S.C. § 1983 and by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Defendants have conspired among themselves to do so (taking numerous overt steps in furtherance thereof) and failed to prevent one another from doing so.

159.    Defendants' actions were deliberate, reckless, and indifferent to plaintiffs' constitutional rights.

### SECOND CLAIM FOR RELIEF / 42 U.S.C. § 1983 – DUE PROCESS – SUSPENSIONS WITHOUT RATIONAL BASIS

160.    Plaintiffs repeat and re-allege paragraphs 1 through 159 as if the same were fully set forth at length herein.

161.    The Fourteenth Amendment to United States Constitution protects fundamental liberty interests against certain governmental intrusions irrespective of the fairness of the procedures utilized. This substantive guarantee is intended to prevent state actors from employing their power in an abusive or oppressive manner.

162.    Defendants' summary suspension practices, their presumption of guilt and the right of the Chair to reject ALJ recommendations violate substantive due process by permitting summary suspensions and the extension of summary suspensions without evidence or a factual basis for the determination that the driver's licensure poses any direct or substantial threat to

public safety. Depriving plaintiffs of the right to serve their passengers and to earn a living   is

unconstitutionally arbitrary and does not serve any legitimate state interest.

163.    Defendants' actions were deliberate, reckless, and indifferent to plaintiffs'

constitutional rights.

## THIRD CLAIM FOR RELIEF / VIOLATION OF THE NYC CODE AND THE NYC CHARTER DUE TO SUSPENSIONS

164.    Plaintiffs repeat and re-allege paragraphs 1 through 163 as if the same were fully

set forth at length herein.

165.    The authority to suspend or revoke a taxi or FHV license is defined and limited by

the NYC Administrative Code. A summary suspension can only be premised on a direct and

substantial threat to the public health or safety.

166.    The TLC suspended plaintiffs' licenses without there being any demonstrated

threat to public health or safety, but on an arrest alone. An arrest does not indicate and public

threat.

167.     A City agency may not enact a rule that is contrary to or in excess of legislative

authority. Such actions arbitrary and capricious and affected by an error of law and are ultra vires

in violation of Article 78 of the N.Y. Civil Practice Law and Rules.

168.    Defendants' actions were deliberate, reckless and indifferent to plaintiffs' legal

rights.

## FOURTH CLAIM FOR RELIEF / VIOLATION OF THE NYC CODE AND THE NYC CHARTER DUE TO THE HEARING PROCESS

169.    Plaintiffs repeat and re-allege paragraphs 1 through 168 as if the same were fully

set forth at length herein.

170.    The NYC Code requires summarily suspended drivers be afforded a hearing "before an administrative tribunal of competent jurisdiction," presumably an independent court, at which they might challenge the grounds for the suspension. A practice by which the administrative tribunal must deem arrest charges, often based on one-sided hearsay, "true," defeats the drivers' rights to defend their licenses based on all the facts and law. This practice is inconsistent with the NYC Code, was never properly enacted and makes the hearing process unfair.

171.    Such actions arbitrary and capricious and affected by an error of law and are ultra vires in violation of Article 78 of the N.Y. Civil Practice Law and Rules.

172.    Defendants' actions were deliberate, reckless and indifferent to plaintiffs' legal rights.

## FIFTH CLAIM FOR RELIEF / CONVERSION

173.    Plaintiffs repeat and re-allege paragraphs 1 through 172 as if the same were fully set forth at length herein.

174.    Defendants without authority assumed assumption and exercise of the right of ownership over plaintiffs licenses, which are a form of property, to the exclusion of plaintiffs' rights.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs and the Class Members pray for relief as follows:

(i) A declaratory judgment that the Defendants' pattern, practice, or custom denies drivers due process of law;

(ii) A declaratory judgment that the Defendants' pattern, practice, or custom is arbitrary, capricious and irrational and is therefore unconstitutional;

(iii) A declaratory judgment that the Defendants' pattern, practice, or

custom is ultra vires and in violation of the NYC Code;

(iv) A preliminary and permanent injunction against the Defendants summary suspension practice, from imposing a presumption that drivers are guilty of the arrest charges, and from permitting the Chair to overrule hearing decisions;

(v) Certification of the case as a class action under Fed. R. Civ. P. 23(b)(2) and/or (b)(3);

(vi) Designation of the Plaintiffs as the representatives of the Class;

(vii) Compensatory damages;

(viii) Punitive damages against the individual defendants;

(ix) Pre- and post-judgment interest as provided by law;

(x) Reasonable attorney's fees and costs incurred herein to the extent allowable by law;

(xi) Payment of a reasonable service award to the Plaintiffs, in recognition of the services they have rendered and will continue to render to Class Members, and the risks they have taken and will take; and

(xii) Such other and further equitable relief, including nominal damages, as this Court deems necessary, just, and proper.

## JURY DEMAND

Plaintiffs demand a jury trial.

Dated: New York, New York
       May 5, 2023

_/s/_____
Daniel L. Ackman
Law Office of Daniel Ackman
26 Broadway, 8th Floor
New York, NY 10004
Tel: (917) 282-8178
dan@danackmanlaw.com

*Attorney for Plaintiffs*